**BOMBARDIER CORPORATION,**
Plaintiff,

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION, Defendant.**

No. CIV. 01–2335(RJL).

United States District Court,
District of Columbia.

Sept. 30, 2002.

Timothy F. Brown, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, Leslie Gordon Fagen, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, Richard John Webber, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for National R.R. Passenger Corp.

Philip LeBreton Douglas, Pillsbury & Winthrop, LLP, New York, NY, for Bombardier Corp.

## MEMORANDUM ORDER

LEON, District Judge.

On May 1, 1996, Bombardier Corporation ("Bombardier"), GEC Alstom ("Alstom"), and National Railroad Passenger Corporation ("NRRPC," "Amtrak") entered into three fixed price contracts (collectively referred to as "Contract") for the design and construction of high-speed passenger trainsets, locomotives, rail equipment, and facilities to be operated by Amtrak in the Northeast corridor.[1] These

---

1. While only Bombardier and Amtrak are parties to the instant action, Bombardier joined with Alstom Transportation Inc., in submitting technical and commercial proposals to

trainsets comprise the Acela Express trains, now in use between Washington, D.C., and Boston, Massachusetts.

The design and construction processes have been riddled with problems from the start. Both Bombardier and Amtrak agree that "performance under the Contracts has been plagued by delays." [2] According to Amtrak, delivery on the fifteen trainsets was, in aggregate, 6,900 days late, with the first trainset, scheduled to be delivered in November 1999, arriving 351 days late.[3] Bombardier argues that Amtrak is to blame for the delay in putting the Acela trains into operation because Amtrak repeatedly changed design specifications, delayed in approving design specifications, insisted on defective or impracticable design modifications and unnecessary testing requirements, and failed to complete track modernizations and electrification necessary to accommodate the high-speed trainsets. Amtrak, in turn, argues that any delay is attributable to Bombardier as subcontractors that Bombardier selected were late in delivering brakes and other train components to Bombardier. Further, Amtrak claims that track electrification did not contribute to manufacturing delays. Aside from delay, Amtrak maintains that the trainsets Bombardier delivered do not meet the Contract's specifications. Specifically, Amtrak contends that there are cracks in the steel used to construct the carbody frames, that the trains have not qualified for the speeds designated in the Contract, and other design defects exist that hamper the trains' "optimal performance." [4]

On November 8, 2001, Bombardier Corporation ("Bombardier") brought suit against the National Railroad Passenger Corporation ("NRRPC," "Amtrak") seeking at least $200,000,000 in damages. Before the Court can reach the merits of Bombardier's claims against Amtrak, however, it must first determine whether these claims are appropriately before the Court at this time. The Contract executed by Bombardier, Alstom, and Amtrak contained a dispute resolution provision for claims "arising from or related to the Contract." According to Amtrak, Bombardier is barred, as a matter of law, from seeking relief here because it did not first submit its claims, presently before this Court, to the dispute resolution processes provided for by the Contract. Therefore, Amtrak asks that Bombardier's Complaint be dismissed.

Because the Court finds that dispute resolution was not a condition precedent to litigation, Amtrak's Motion to Dismiss is DENIED.

### The Contract

According to Article 32 of the Contract between Amtrak and Bombardier and Alstom, "any Claim relating to this Contract" is subject to the dispute resolution provisions of Article 32. Article 29 of the Contract defines a "claim" to be:

> a "demand or assertion by one of the parties seeking, as a matter of right: (i) an adjustment or interpretation of Contract terms, (ii) payment of money, (iii) an extension of time, (iv) other relief with respect to the terms of the Contract, or (v) a resolution of all other disputes and matters in question be-

---

Amtrak for the construction of the high-speed trainsets and locomotives; Amtrak ultimately awarded the contract to Bombardier and Alstom, referred to as the "Consortium," on March 15, 1996.

**2.** See Def.'s Mot. to Dismiss at 7, Pl.'s Compl. ¶¶ 11, 12.

**3.** See Def.'s Mot. to Dismiss at 7.

**4.** See id. at 10.

tween Amtrak and Contractor arising out of or relating to the Contract."[5]

Claims, which must be made by written notice,[6] are initially referred to a Contracting Officer Representative ("COR") or Contracting Officer's Technical Representative ("COTR") for review.[7] Only after the COR or COTR has made a decision regarding the claim may a party seek a final decision from a Contracting Officer ("CO").[8] If the party disagrees with the Contracting Officer's final decision, the party may then pursue its claim before the Dispute Resolution Board (DRB), in accordance with the terms and provisions of Article 32.

Article 32, entitled "Resolution of Claims and Disputes," outlines the procedures parties must follow when submitting Claims to the Dispute Resolution Board. In particular, it provides that "any Claim relating to this Contract which is not disposed of by agreement of the parties shall be referred to and decided by the Contracting Officer." While this provision uses mandatory language, the DRB has jurisdiction over only two types of Claims: disputes regarding money damages, and rulings on whether particular services or work required by a Change Order is within the scope of Bombardier's and Amtrak's Contract.[9] Article 32 also stipulates that decisions of the DRB are binding only if disputes involve $5 million or less; if the dispute involves more than $5 million, the DRB's decision is not binding unless the parties agree to it. Moreover, Article 32 provides that if the parties are "unable to resolve their dispute through negotiation or the DRB," the parties may then pursue

their Claim here, in the United States District Court for the District of Columbia.[10] Finally, the DRB provisions require the parties, "[p]ending a final court decision of a dispute," to proceed with their performance under the Contract.[11]

## Dispute Resolution is Not a Condition Precedent to Litigation

Amtrak argues that Bombardier's claims now before this Court fall squarely within the Contract's dispute resolution provisions. First, Bombardier's claims are "Claims," as defined by the Contract, because they are either demands for the "payment of money," or "seeking . . . a resolution of all other disputes and matters in question between Amtrak and Contractor [Bombardier] arising out of or relating to the Contract," per Article 29. Second, Amtrak maintains that these Claims fall within the dispute resolution processes of Article 32 because demands for payment of money, or for resolution of disputes and matters in question between Amtrak and Bombardier, necessarily relate to the Contract. Amtrak argues that the language of Article 32, and all other provisions of the Contract relating to dispute resolution proceedings, is plain and unambiguous, and leads to only one conclusion: that submission of Claims relating to the Contract to the dispute resolution process is mandatory, and that Bombardier's failure to submit the claims now before this Court to a COR, then to a CO and finally to a DRB, bars it from seeking relief here.

Bombardier, however, maintains that submission of Claims to the Contract's dispute resolution process outlined in Article

---

5. *See Def.'s Exh., Article 29.*

6. *See 29.1.*

7. *See 29.2.*

8. *See id.*

9. *See Article 32.1.*

10. *See Article 32.4.*

11. *See Article 32.5.*

32 is not a condition precedent to litigation. Bombardier contends that in the context of construction contracts, judicial relief is barred by dispute resolution procedures *only* if those procedures are explicitly made a condition precedent to litigation.[12] As the Contract does not expressly state that the dispute resolution procedures outlined in Article 32 are a condition precedent to litigation, Bombardier contends that the instant action was properly filed. Also, Bombardier claims that the purpose of dispute resolution procedures in construction contracts, such as this, is to handle discrete disputes that arise during the " 'operational phases of construction.' " [13] Bombardier argues that its claims are not mere construction disputes, arising during the course of construction, but post-performance delay and disruption claims that fall outside the scope of the Contract's dispute resolution procedures.

 The Court finds that, in regard to Bombardier's claims, the dispute resolution procedures contained in the Contract are not a condition precedent to litigation. As the court stated in *Shook of West Virginia, Inc. v. York City Sewer Authority*, 756 F.Supp. 848 (M.D.Pa.1991), "language in a contract not clearly identified as a condition precedent is presumed not to be one." Like the instant action, the parties in *Shook* executed a construction contract that contained a dispute resolution provision.[14] Shook, the contractor, brought suit against the project engineer, the York City Sewer Authority, alleging that York's interference, disruption to and stoppage of Shook's work resulted in Shook's delay in completing the project. *Id.* at 850–51. York argued that the court must dismiss the suit because the contract "clearly and unambiguously requires Shook to permit the project engineer to issue a decision as a prerequisite to litigation." *Id.* at 851. The court in *Shook* disagreed, explaining that the presumption against a contract provision being a condition precedent, unless clearly identified as such, is "[n]owhere … more important than in construing a provision that would divest a party of the right to have a court hear its claims." *Id.* at 851–52.

That principle is especially important where, as here, a party contends that the dispute resolution processes are mandatory and an absolute prerequisite to litigation for any type of claim, no matter how peripheral, significant or comprehensive, so long as it is related in to the Contract. While the Court recognizes that the parties may have intended for some disputes to be handled through the dispute resolution processes of Article 32,[15] the Court

---

**12.** *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 15–22.

**13.** *See id.* at 23 (quoting *County of Rockland v. Primiano Construction Co.,* 51 N.Y.2d 1,11, 431 N.Y.S.2d 478, 409 N.E.2d 951 (1980)).

**14.** *See Shook,* 756 F.Supp. at 849. Section 9.9 of the Contract at issue in *Shook,* entitled "Decisions and Disagreements," states "The ENGINEER will be the initial interpreter of the terms and conditions of the Contract Documents and the judge of the performance thereunder…. Claims, disputes and other matters relating to the execution and progress of the Work or the interpretation of or performance under the Contract Documents *shall be referred initially to the ENGINEER for decision,* which he shall render in writing within a reasonable time." (emphasis added).

**15.** The claims Bombardier now makes, however, are not disputes relating to discrete matters arising during the course of construction; instead, the Amended Complaint brings into question the totality of the Contract between the parties. Bombardier argues that Amtrak systematically, throughout the course of the Contract, changed design specifications, provided inaccurate information regarding track infrastructure and electrical systems, and insisted on unnecessary testing that interfered with Bombardier's ability to perform in a

does not agree with Amtrak's assertion that a party's failure to submit its claims to the Article 32 dispute resolution procedures is an absolute bar to litigation. As the court in *Mario & DiBono Plastering Co., Inc. v. Rivergate Corp.*, 140 A.D.2d 164, 527 N.Y.S.2d 417, 418–19 (N.Y.App. Div.1988) found, "in the absence of such a clear, express, and unequivocal condition precedent, we decline to hold that plaintiff has waived its right to a day in court to litigate its claims against the general contractor, particularly since the provision . . . is, at best, a mediation—and not an arbitration—process." Like the provision at issue here, the dispute resolution in *Rivergate* used mandatory language: " 'any claim . . . in question between the Subcontractor and General Contractor' was to be 'first submitted by the claiming party . . . in writing to the Architect . . . .' " If the parties intended such a total requirement, it is essential that the contract reflect this clearly and unambiguously. It does not do so here.

Not only does the Contract fail to clearly and unambiguously state that dispute resolution is a condition precedent to litigation, it contains two provisions that arguably make the parties' participation in dispute resolution optional, not mandatory. In Article 29.3, the Contract states that if the Contractor—Bombardier—disagrees with either the COR's or COTR's decision, the Contractor "*may* pursue the Claim in accordance with . . . Article 32," the dispute resolution procedures. Article 29.3 (emphasis added). The Contract in Article 32.3 provides that "[i]n the event that the parties are unable to resolve their dispute through negotiation *or* the DRB . . . the parties may pursue their rights or reme-

dies in law or in equity with respect to any Claim for which a final and binding decision has not been issued . . . in the United States District Court for the District of Columbia" (emphasis added). By using the words "may," and "or," the Contract suggests that the Contractor may permissibly choose *not* to engage in the dispute resolution procedures of Article 32. Construed together, it appears that the Contractor is free to pursue its claims in court, without first engaging in dispute resolution under Article 32, once it has submitted its Claims to the COR or COTR.

It is difficult to reconcile language that seems to make dispute resolution not a requirement but a choice, with Amtrak's contention that participation in a DRB must always precede litigation without exception. Given Amtrak's position that any claim—no matter how distantly or peripherally related to the Contract—must be submitted to dispute resolution procedures as a condition precedent to litigation, it is especially important that the Contract clearly and unequivocally state this condition. Here, Articles 29.4 and 32.3 call into question whether dispute resolution is, in fact, an absolute condition precedent to litigation. Due to this ambiguity, the Court finds that Bombardier's failure to submit its claims to the dispute resolution procedures of Article 32 does not bar it from seeking relief here.

Moreover, the Court believes that granting Amtrak's motion to dismiss, thereby sending the parties to dispute resolution, is a futile endeavor that ultimately contravenes the purpose of the Contract's dispute resolution provision. Amtrak argues that the primary benefit of dispute resolu-

---

timely manner. While Amtrak has not yet filed its Answer, Amtrak argued in its motion to dismiss that any blame for delay in manufacturing and the trainsets' nonconformity with design specifications must be attributed

to Bombardier. These claims are not isolated to particular events occurring during the course of construction, but call into question the manner in which the parties performed the entire Contract.

tion is efficiency: the parties' claims are handled in an "efficient cost effective"[16] manner, and may be narrowed by the dispute resolution procedures.[17] In this instance, however, the interests of efficiency and expediency will not likely be served by dismissing Bombardier's claims and directing it to complete the dispute resolution procedures before returning to court. Bombardier's suit before this court seeks damages totaling at least $200,000,000,[18] whereas the DRB's ability to render binding decisions is limited to Claims of $5 million or less. Amtrak insists that the DRB's inability to render binding decisions for Claims over $5,000,000 does not prevent it from considering a Claim for $200,000,000, because the DRB has the "express contractual authority to determine whether these are good faith claims,"[19] and to determine the amount involved in the dispute.

While this may be true, resolving what now appears to be a comprehensive claim[20] in a piecemeal manner is contrary to the purpose of dispute resolution procedures in construction contracts. In fact, the structure of the DRB suggests that Claims of a magnitude similar to Bombardier's claims before this Court are outside the purview of a the Dispute Resolution Board, as described by Article 32.[21] In light of the scope and breadth of issues now before the Court, it seems unlikely that the DRB would have been able to give Bombardier's Claims their due consider-

ation in the timetable contemplated by the parties in Article 32.

Finally, the Court would note that the parties have already engaged in extensive and costly settlement discussions and negotiations that appear to have come to naught. While the substance of those discussions and negotiations are unknown to the Court as they are protected by a confidentiality agreement, the fact that they took place, involved extensive written submissions regarding the plaintiff's claims, and that the parties appear to have reached a stalemate in their discussions, further convinces the Court that returning this complex and comprehensive dispute to the Contract's dispute resolution process would be, *at this point in time*, a delay ridden and expensive process with little likelihood to resolve the dispute in a mutually agreeable manner.

Accordingly, for the reasons stated above, Amtrak's Motion to Dismiss is DENIED. In addition, Amtrak's Motion to Stay Proceedings Pending Resolution of the Motion to Dismiss is also DENIED as moot.

SO ORDERED.

---

16. Hr'g Tr. at 28, ll. 21–24 (Argument of Leslie Gordon Fagen for Amtrak).

17. *Id.* at 64, ll. 3–6.

18. Amtrak's counsel has indicated to the Court that it will have cross claims against Bombardier totaling approximately $250,000,000. *See also supra* note 15, and accompanying text.

19. Hr'g Tr. at 64, ll. 5–10.

20. *See supra* note 15, and accompanying text, for description of the claims.

21. The timetable provided for DRB review of Claims underscores this fact. The Contract stipulates that once notice of a Claim is provided to the DRB by the Contractor, the DRB must contact the parties within seven days to arrange a hearing. Within thirty days of the hearing, the DRB must issue its ruling. *See* Article 32.3.